IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **ORDONT ORTHODONTIC LABORATORIES, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**ORTHO SOLUTIONS, LC d/b/a DYNAFLEX,**<br><br>Defendant. | Case No. 4:23-cv-00468 |

## MOTION TO DISQUALIFY

COMES NOW Plaintiff Ordont Orthodontic Laboratories, Inc., ("Ordont") for its Motion to Disqualify the law firm of Lewis Rice as counsel for Defendant and states as follows:

## INTRODUCTION

Lewis Rice was Plaintiff's general counsel and only attorney for two decades. Lewis Rice represented Plaintiff extensively with respect to the specific product at issue in this trademark infringement case. Lewis Rice's representation of Plaintiff ended only after:

1) Plaintiff consulted Lewis Rice about representing it in *this very matter*,
2) Plaintiff emailed Lewis Rice attorney Brian Pezza the details of Defendant's infringement,
3) attorney Pezza responded to Plaintiff that Pezza would "connect with one of our IP guys and get back to you asap,"
4) attorney Pezza and Plaintiff had a follow-up phone call in which they further discussed Defendant's infringement and Plaintiff's legal strategy, and
5) Pezza ended the call by telling Plaintiff that Lewis Rice would "look into" Plaintiff's claims.

Lewis Rice never disclosed that it was ending its representation of Plaintiff to litigate against Plaintiff and never sought a conflict waiver from Plaintiff.

**STANDARD OF REVIEW**

In November of 2020, Chief Judge Clark entered an order analyzing the standard for analyzing a motion to disqualify counsel for a conflict of interest in this District. *Bayes v. Biomet, Inc.*, 500 F. Supp. 3d 810 (E.D. Mo. 2020). Judge Clark noted that "the decision to grant or deny a motion to disqualify an attorney rests in the discretion of the district court." *Id.*, citing *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1154 (8th Cir. 1999). In exercising this discretion, a trial court is bound by the Rules of Professional Conduct adopted by the Missouri Supreme Court and the American Bar Association. *Id.* "[B]ecause motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, they are decided by applying standards developed under federal law." *Id.*, citing *Dalton v. Painters Dist. Council No. 2*, No. 4:10CV01090 AGF, 2011 WL 1344120, at *4 (E.D. Mo. Apr. 8, 2011).

Missouri ethics rule 4-1.9 prohibits an attorney "who has formerly represented a client in a matter" from representing a materially-adverse party "in the same or a substantially related matter," unless the former client consents in writing. Mo. S.Ct. R. 4-1.9(a). Further, Rule 4-1.10 provides that a conflict of interest as to any attorney in a law firm is imputed to all attorneys in the firm. Mo. S.Ct. R. 4-1.10. *Bayes*, 500 F. Supp. 3d at 815.

"To establish a conflict of interest under Rule 4–1.9, a movant must prove that: (1) the attorney had a former attorney-client relationship with the movant; (2) the interests of the attorney's current client are materially adverse to the movant's interests; and (3) the current representation involves the same or a substantially related matter as the attorney's former representation of the movant." *Id.*, at 816 (quoting *Zerger & Mauer LLP v. City of Greenwood*, 751 F.3d 928, 932 (8th Cir. 2014)).

## ARUGMENT

**A. Lewis Rice has a former attorney-client relationship with Plaintiff.**

Lewis Rice began representing Plaintiff in approximately August of 2003. (Declaration of Paul Ruzicka, ¶ 4, *hereinafter*, "Ruzicka Decl.")  Shortly thereafter, Lewis Rice became Plaintiff's general counsel. (*Id*., at ¶ 11)  Lewis Rice provided all of Plaintiff's legal representation from 2003 through December of 2021. (*Id*., at ¶ 12)  In December of 2021, Lewis Rice consulted Plaintiff with regard to this lawsuit and then suddenly terminated its representation without telling Plaintiff that it was going to represent Defendant in its efforts to invalidate Plaintiff's "SmileSeries" trademark *or seeking a conflict waiver from Plaintiff*. (*Id*., at ¶ 12, 61–74).

It is simply beyond dispute that Lewis Rice had an attorney-client relationship with Plaintiff, especially given Judge Clark's observation in *Bayes*, that an attorney-client relationship exists where an attorney "represented [a client] in at least one matter while at [a law firm.]" *Bayes*, 500 F.Supp.3d at 816.

Lewis Rice's representation of Plaintiff was unlimited in scope.  Missouri ethics rule 4-1.2(c) provides that "[a] lawyer may limit the scope of representation [only] if the client gives informed consent in a writing signed by the client to the essential terms of the representation and the lawyer's limited role."  Comment 2 to the rule underscores that "[u]se of a written agreement for limited representation is required."

Plaintiff recently demanded that Lewis Rice turn over his entire legal file. (Exhibit 1) Lewis Rice produced some, but not all of Plaintiff's file and refused to produce communications between its attorneys about Plaintiff's representation. (*Id*.)  The portions of the file which were produced contain no engagement agreement or other documents whatsoever which purport limit

3

the scope of Lewis Rice's representation of Plaintiff, much less a "written agreement for limited representation" which satisfies the requirement in Rule 4-1.2(c). Lewis Rice's file confirms Plaintiff's understanding that Lewis Rice served as Plaintiff's general counsel for nearly two decades.

Moreover, Lewis Rice specifically represented Plaintiff in *this very matter*. Comment 2 to Missouri rule 4-1.2 states that "[t]he initial consultation ends when the lawyer and the client agree that the lawyer will or will not undertake the representation." Here, Plaintiff reached out to its attorney on December 7, 2021. (Exhibit 2)

> **From:** Paul Ruzicka
> **Sent:** Tuesday, December 7, 2021 9:49 AM
> **To:** Pezza, Brian P. <BPezza@lewisrice.com>
> **Subject:** Ordont labs
>
> Brian
>   Dynaflex, one of my competitors was sued by Invisalign because their name EZAlign for sequential aligners was too similar to theirs. Recently they changed the name to SmileShare   https://www.dynaflex.com/smileshare-about/
>
> Our sequential aligners is called SmileSeries.    Could we discuss this?
>
> Paul

Attorney Pezza responded later that afternoon indicating that he would look into the matter. (*Id.*)

> **From:**  Pezza, Brian P.
> **To:**  Paul Ruzicka
> **Subject:**  Re: [EXTERNAL] FW: Ordont labs
> **Date:**  Tuesday, December 7, 2021 2:19:33 PM
> **Attachments:**  image001.png
>   image003.png
>   image001.png
>   image003.png
>
> Paul-I am going to connect with one of our IP guys and get back to you asap. -Brian
>
> Sent from my iPhone

Shortly thereafter, Attorney Pezza conducted a detailed phone call with Plaintiff's president, Paul Ruzicka . (Ruzicka Decl., ¶ 65)  Pezza and Ruzicka discussed Plaintiff's

4

potential claims and litigation strategy, as well as the history of the relationship between Plaintiff and Defendant. (*Id.*)  Plaintiff had years of experience with Attorney Pezza stopping a conversation if Lewis Rice's conflict check was incomplete, as well as with Attorney Pezza requesting more information when that information was necessary to run a conflict check. (*Id.*, at ¶¶ 66–72, Exhibits 3, 4, 5, 6)  In fact, Attorney Pezza's very first email to Ordont was a request to re-run a conflict check. (Exhibit 7)  This time, Attorney Pezza did not ask for any additional information or tell Plaintiff to wait until a conflict check was complete to discuss the matter. (Exhibit 2)  Attorney Pezza conducted a detailed discussion of the case, presumably aided by information he got from his discussion with "one of [Lewis Rice's] IP guys," and ended the call by telling Plaintiff, "we'll look into it." (Ruzicka Decl., at ¶ 71–72)  Plaintiff reasonably understood that Lewis Rice had agreed to undertake the representation.

**B. The interests of Lewis Rice's current client (Defendant) are materially adverse to Plaintiff's interests.**

Plaintiff and Defendant are adverse parties in this lawsuit.  Their interests are materially diverse. *Bayes*, 500 F.Supp.3d at 816–17. (quoting *Zerger & Mauer LLP v. City of Greenwood*, 751 F.3d 928, 933 (8th Cir. 2014) for the proposition that the question of materially adverse interests is "not a difficult question" where a new client and a former client are adverse parties in a lawsuit.)

In proceedings before the United States Patent and Trademark Office, before the Trademark Trial and Appeal Board (USPTO and TTAB, respectively) Lewis Rice wrote that "[Plaintiff's] SMILESERIES mark is a weak, descriptive mark that can only be afforded a narrow scope of protection." (Exhibit 8, Pg. 4, ¶ 2)  In support of a motion to dismiss in this case, Lewis Rice argues that its former client's claims are "absurd," will "ultimately fail on the

5

merits," and that "two of the Counts [sic] of Plaintiff's Complaint should be dismissed now because they fail as a matter of law." (Doc. No. 14)  Lewis Rice attempts to minimize the size of Plaintiff's business, arguing that "Plaintiff only had 'thousands' of sales" and therefore has no business pestering Lewis Rice's new, apparently more profitable client with a lawsuit. (*Id.*)

**C. Lewis Rice's current representation of Defendant involves the same or a substantially related matter as its former representation of Plaintiff.**

As discussed above, Lewis Rice represented Plaintiff in <u>this</u> matter.  That alone should end this Court's inquiry.  Even if Lewis Rice had terminated its representation of Plaintiff before this matter, it would still be barred from representing Defendant because this matter is "substantially related" to the rest of Lewis Rice's decades-long representation of Plaintiff.

Comment 3 to Missouri rule 4-1.9 makes it clear that

> "[m]atters are 'substantially related' . . .if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.  For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking  a dissolution of marriage or divorce."

The Missouri Supreme Court analyzes six non-exclusive factors in determining whether representations are substantially similar.  They are:

(1) the case involved the same client and the matters or transactions in question are relatively interconnected or reveal the client's pattern of conduct;

(2) the lawyer had interviewed a witness who was key in both cases;

(3) the lawyer's knowledge of a former client's negotiation strategies was relevant;

(4) the commonality of witnesses, legal theories, business practices of the client, and location of the client were significant;

6

(5) a common subject matter, issues and causes of action existed; and

(6) information existed on the former client's ability to satisfy debts and its possible defense and negotiation strategies.

*Bayes*, 500 F.Supp.3d. at 817 (quoting In re Carey, 89 S.W.3d 477, 494 (Mo. 2002)).  All six factors are present here.

### 1. This case involves the same client and the matters or transactions in question are relatively interconnected or reveal the client's pattern of conduct.

Lewis Rice's representation of Plaintiff has always been related to the SmileSeries products, including the trade secrets and trademark.  From the beginning of Lewis Rice's representation of Plaintiff in 2003, Plaintiff devoted more employees, resources, and funds to manufacturing the SmileSeries aligner trays at issue in this lawsuit than to any other product or line of business.  (Ruzicka Decl., at ¶ 7)  The SmileSeries aligner trays at issue in this lawsuit have always been Ordont's biggest and most resource-intensive line of business. (*Id*.)

Plaintiff's "SmileSeries" trademark was registered on April 11, 2017. (Exhibit 9)  That same year, Defendant approached Plaintiff looking to buy the SmileSeries line of business. (Ruzicka Decl., ¶ 34).  Lewis Rice represented and advised Plaintiff with respect to this potential sale. (*Id*., ¶ 35-38)   Lewis Rice was already intimately familiar with Plaintiff's business, including its assets, liabilities, products, revenues, and trade secrets because it represented Plaintiff with respect to a prior potential sale. (*Id*., at ¶ 37)  Now, Lewis Rice's job was to advise Ordont during negotiations with *Defendant* wherein Defendant's goal was to acquire information about the SmileSeries aligner tray business at issue in this lawsuit. (*Id*., at ¶ 38). Lewis Rice helped Plaintiff to determine what information should be disclosed to Defendant in order to facilitate Defendant's due diligence and what information should be withheld from Defendant in

7

order to protect Plaintiff's trade secrets. (*Id*., at ¶ 39)  Lewis Rice then helped Plaintiff determine what information should be disclosed to Defendant, as well as what information should be excluded from the disclosure in order to protect Plaintiff's trade secrets. (*Id*., at ¶ 30).  When the negotiations were unsuccessful, Lewis Rice advised Plaintiff on several items related to Ordont's corporate structure which would make Ordont more competitive in the future. (*Id*., at ¶ 44)  Lewis Rice continued to advise Plaintiff regarding a potential sale to Defendant, which continued to express interest.  Plaintiff exchanged emails with Lewis Rice about the possibility of a sale to Defendant in April of 2019. (*Id*., at ¶ 45, Exhibit 10).

Now, Lewis Rice has advanced arguments on behalf of Defendant that Plaintiff manufactures, markets, and sells the SmileSeries aligner trays in ways that do not entitle Plaintiff to the same trademark protection that gave the company value when Lewis Rice's job was to maximize Plaintiff's value in a sale to the Defendants.  This matter is substantially related to Lewis Rice's prior representation of Plaintiff.

**2. Lewis Rice's lawyers spent years interviewing the key witnesses in this case.**

For almost two decades, Lewis Rice interacted with and maintained records on every single individual who had any role in the manufacturing, design, marketing, and sales of the SmileSeries aligner trays at issue in this lawsuit.

Lewis Rice's primary point of contact with Plaintiff is its president, Paul Ruzicka. (Ruzicka Decl., at ¶ 12).  Lewis Rice was Ruzicka's "first call" any time he had a business or legal question." (*Id*.)  As a result of one such call, Lewis Rice helped Plaintiff to create a non-union operations manager to oversee all aspects of the SmileSeries aligner tray business. (*Id*., at ¶ 13)  Lewis Rice negotiated with the union to ensure that the individual in this role would not need to be a member of the union. (*Id*. at 15)  To accomplish this, Lewis Rice had to

8

understand the role of the operations manager, as well as the roles of the employees manufacturing the aligner trays, and articulate the significant differences between the two during negotiations. (*Id*.)  Lewis Rice was able to do this because for years it interviewed and interacted with the individuals who physically manufactured the SmileSeries aligner trays. (*Id*., at ¶ 23–24)  These interviews were part of Lewis Rice's union negotiations on behalf of Plaintiff. (*Id*.)  They continued after the union was decertified and Lewis Rice advised and negotiated with regard to individual employees. (*Id*.)

The portions of Plaintiff's file that Lewis Rice produced contain detailed information about the pay and productivity of every single individual who produced the SmileSeries aligner trays.  The file contains information about the production costs and profitability of the SmileSeries aligner trays.  Lewis Rice interviewed and continues to possess detailed information about literally every witness Plaintiff could call in this case.

### 3. Lewis Rice's knowledge of Plaintiff's negotiation strategies is relevant.

Lewis Rice's knowledge of Plaintiff's negotiation strategies is absolute.  As discussed above, Lewis Rice was either in charge of or consulted on almost every negotiation Plaintiff conducted for nearly two decades.  Lewis Rice negotiated on behalf of Plaintiff with Plaintiff's employee union. (*Id*., at ¶ 4)  Lewis Rice negotiated on behalf of Plaintiff with its employees after the union was decertified. (*Id*., at ¶ 23) Lewis Rice advised or managed Plaintiff's negotiations during three potential mergers, including with the Defendant in this lawsuit, giving Lewis Rice insight not only into how Plaintiff negotiates generally, but also into how Plaintiff negotiates specifically with Lewis Rice's new client. (*Id*., at ¶¶ 31, 36–41, 47–52)

9

### 4. The commonality of witnesses, legal theories, business practices of Plaintiff, and location of Plaintiff are significant.

As discussed above, this matter is identical to Lewis Rice's former representation of Plaintiff. The matters share "commonalities" because they are literally the same. Plaintiff's business practices are the same now as they were when Lewis Rice represented Plaintiff, because Lewis Rice represented Plaintiff until the moment it terminated its representation in this matter so that it could represent Defendant. Both Plaintiff and Defendant are located in St. Louis, in the same market, with the same customers–so much so that Defendant sought to purchase Plaintiff for more than five years before appropriating Plaintiff's trademark. In *Bayes*, Judge Clark was presented with a case where "any commonality [was] *post hoc*, because the firm that represented the defendant employed an associate who had previously worked at a firm which represented another company that the defendant acquired. *Bayes*, 500 F.Supp.3d at 819. In this case, multiple partners still employed by Lewis Rice represented Plaintiff in negotiations against defendant for years prior to this litigation, and terminated their representation of Plaintiff specifically in order to take a position adverse to the client they had just fired.

### 5. A common subject matter, issues and causes of action exist between this matter and Lewis Rice's representation of Plaintiff.

From 2003 until Lewis Rice ended its representation of Plaintiff in this lawsuit, Lewis Rice was Plaintiff's only law firm. (Ruzicka Decl., at ¶ 12) Lewis Rice was Plaintiff's first call any time it had a business or legal question. (*Id*.) Plaintiff's president's declaration details a variety of matters over many years for which Lewis Rice had to learn and use extensive, private financial and business information about the products at issue in this trademark case in order to represent Plaintiff in a variety of matters. This was information that Plaintiff never made

available to any other party, including detailed financial information necessary to advise Plaintiff as it considered a sale of the company. (*Id.*, at ¶ 10–11). In Defendant's hands, that information could be used to determine in granular detail Plaintiff's litigation strategy and budget–information that would never be discoverable and which could significantly impact Defendant's strategy in this matter.

Plaintiff's fifteen-page declaration is not an exhaustive list of these matters–Plaintiff selected the most relevant situations which it could support with the limited portions of its file which Lewis Rice chose to produce.[1]  The takeaway from Plaintiff's declaration is clear–Lewis Rice's representation of Plaintiff encompassed the entirety of the "subject matter, issues, and causes of action" that are part of Lewis Rice's current representation of Defendant.

### 6. Information exists in Lewis Rice's possession on Plaintiff's ability to satisfy debts and its possible defense and negotiation strategies.

From the beginning of (and throughout) Lewis Rice's representation of Plaintiff, Plaintiff devoted more employees, resources, and funds to manufacturing the aligner trays at issue in this lawsuit than to any other product or line of business. (Ruzicka Decl., at ¶ 7)  As a result, Lewis Rice's representation of Plaintiff was nearly always connected in some way to the product at issue in this lawsuit. (Ruzicka Decl., *throughout*)  Plaintiff utilized innovative and proprietary technology and practices to manufacture and market the aligner trays. (*Id.*, at ¶ 8-9)  In order for

---

[1] The production itself leaves much to be desired.  There are issues about which Plaintiff specifically remembers consulting Lewis Rice for which Lewis Rice apparently maintained no documents or communications.  Other issues for which Lewis Rice sent (and Plaintiff paid) bills apparently generated no documents or communications.  One such issue was the preparation of a nondisclosure agreement with Keller Labs relating to the potential sale of Plaintiff's company–during a time when Defendant was also actively interested in purchasing the company in order to acquire the rights to the trademark at issue in this case.  Plaintiff was billed for these services.  Lewis Rice produced no files related to them.  Lewis Rice's files contain no copy of the agreement it prepared, much less drafts or communications about that agreement.  Six attorneys appear in the bills produced by Lewis Rice.  Emails were only produced for two.  Lewis Rice explicitly refused to produce portions of Plaintiff's file that Lewis Rice describes as "internal communications" even though Plaintiff requested all communications between Lewis Rice attorneys about his file and paid for those communications.  It is not entirely clear whether Lewis Rice has mismanaged its file, whether it has deliberately concealed portions from its former client, or whether something else has happened, but it *is* clear that the file Lewis Rice produced to Plaintiff is incomplete.

Lewis Rice to represent Plaintiff, it was necessary for Lewis Rice to have access to private information that Ordont has never made available to any other party. (*Id.*, at ¶ 10)  This information was highly sought after, including by the Defendant in this case as discussed above.

From the beginning of Lewis Rice's representation of Plaintiff in Plaintiff's union negotiations, Plaintiff provided Lewis Rice with business and financial records concerning Plaintiff's business dating to at least the year 2000. (*Id.*, at ¶ 4)  In addition to reviewing these records, several Lewis Rice attorneys came to Plaintiff's laboratory and offices to tour the facilities and develop a better understanding of Plaintiff's operations.  During these visits, Lewis Rice's attorneys observed Plaintiff's employees manufacturing products, including the aligner trays at issue in this lawsuit. (*Id.*, at ¶ 5)  The Lewis Rice attorneys asked Plaintiff's employees, including its president, Paul Ruzicka, questions about how Plaintiff's operations and business practices compared to other businesses in the industry, including Plaintiff's competitors, like Defendant. (*Id.*)  It is possible that no adverse party in history has had access to more information about its opponent's "ability to satisfy debts and its possible defense and negotiation strategies" than Defendant now has through Lewis Rice.

**D.  Plaintiff has not waived this conflict of interest.**

Lewis Rice claims Plaintiff waived its conflict of interest, ignoring the period of time where Lewis Rice represented both Plaintiff and Defendant, and the shorter period where Lewis Rice represented both parties after the conflict developed.  Lewis Rice's argument may have ethical ramifications beyond the scope of this motion, including concerns related to rules 4-1.7 and 4-1.16.  Putting these aside for the time being, it is simply not true that Plaintiff waived any conflict after Lewis Rice terminated the representation.

A party may waive a conflict by failing to timely object. *Bayes*, 500 F. Supp. 3d at 816.

Plaintiff made no such waiver–Plaintiff promptly and repeatedly raised its objections to Lewis Rice's representation of Defendants.  Plaintiff first learned that Lewis Rice represented the Defendant shortly before the parties' pre-litigation mediation.  Plaintiff objected to Lewis Rice's presence at the mediation.  (Ruzica Decl. ¶ 75)  Defendant's representative at the mediation, Darren Buddemeyer, gloated about the representation, stating, "[h]ey, I didn't do it to you, *they did it to you*." (*Id*.)  Buddenmeyer was referring to Lewis Rice.

Plaintiff's first opportunity to object to Lewis Rice's representation of Defendants in this matter was on June 16, 2023, when Lewis Rice filed its Entry of Appearance. (Doc. No. 10). Plaintiff promptly objected to Lewis Rice's representation of Defendant just four days later on June 20, 2023 in an email sent by Paul Ruzicka to his former attorney, Brian Pezza. (Exhibit 1). In that email, Plaintiff demanded a copy of his file from Lewis Rice and instructed the undersigned to begin preparing this motion.  The undersigned immediately began reviewing the approximately 1,500 pages of documents and emails produced by Lewis Rice to Plaintiff.  The undersigned also attempted, unsuccessfully, on Plaintiff's behalf, to obtain the portions of Plaintiff's file that Lewis Rice refused to turn over.  Plaintiff then filed this motion within a month of receiving (parts of) its file from Lewis Rice.

**CONCLUSION**

Lewis Rice represented Plaintiff for two decades.  Lewis Rice represented Plaintiff in matters where it was adverse to Defendant for five years prior to this lawsuit.  Lewis Rice represented Plaintiff in <u>this</u> dispute.  Lewis Rice may not also represent Defendant.

        Respectfully submitted,

        **VOYTAS LAW, LLC**

By:    /s/ Richard A. Voytas, Jr
        Richard A. Voytas, Jr., #52046
        7321 S. Lindbergh Blvd., Ste. 400
        St. Louis, MO  63125
        Phone: 314.380.3166
        Email: rick@voytaslaw.com

*Counsel for Plaintiff*


**HELLER & ASSOCIATES**

/s/ Annette P. Heller
Annette P. Heller
400 Chesterfield Center, Ste. 400
St. Louis, MO 63017
Telephone: (314) 469-2610
tmattorneyheller@aol.com

*Co-Counsel for Plaintiff*

14